CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 0 9 2015

JULIA C. DUDLEY, CLERK
BY: Moody
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

PIPER ROUNTREE,                          )
    Plaintiff,                           )        Civil Action No. 7:11CV00572
                                         )
v.                                       )
                                         )        **MEMORANDUM OPINION**
                                         )
HAROLD CLARKE, et al.,                   )        By: Hon. Glen E. Conrad
    Defendants.                          )        Chief United States District Judge
                                         )

Piper Rountree, a prisoner in the custody of the Virginia Department of Corrections

("VDOC"), proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983 asserting

numerous claims against various VDOC officials and employees. All of her claims arose while

she was an inmate at the Fluvanna Correctional Center for Women ("FCCW"). The case is

before the court on defendants' motion for summary judgment, which seeks dismissal of

Rountree's complaint in its entirety on various grounds.[1] For the reasons set forth herein, the

motion is granted in part and taken under advisement in part.

I.

After initial proceedings in this case, which were focused primarily on the issue of

whether Rountree administratively exhausted the numerous claims she has asserted, see 42

U.S.C. § 1997e(a), the court issued an opinion and order concluding that she had failed to

exhaust most of her claims and that they could not be brought in this suit. Dkt. Nos. 92, 93.

_____

[1] The defendants who have filed the motion are Harold Clarke, J. Jabe, Wendy Hobbs, D. Radcliffe-
Walker, K. Stapleton, P. Soukup, S. Horn, V. Booker, P. Baskerville, and D. Carter. Rountree agrees to the dismissal
with prejudice of D. Carter. Dkt. No. 106 at 1. Three other defendants listed on the docket have not been served or
entered an appearance—Ms. Snow, J. Bland, and T. Cox. None of these defendants are named in the only claim not
dismissed herein—Rountree's fourth claim. It is thus immaterial that they have not been served or entered an
appearance. For the same reason, the court will not address the parties' arguments regarding service upon T. Cox.
Compare Dkt. No. 106 at 2 (Rountree arguing that the court should deem service upon T. Cox effective); with Dkt.
No. 100 at 1 n.1 (defendants noting that T. Cox has not been effectively served).

There were four claims, however, that the court concluded were exhausted. As to those four claims, the court instructed Rountree to file a supplement to her amended complaint that clearly and succinctly set forth the factual basis for each. Rountree's filing, which this court treats and refers to herein as her complaint, refers to other instances of alleged constitutional violations. See generally Dkt. No. 94. Consistent with the court's prior order, however, the court limits its discussion to those four claims properly before it:

1. Rountree's legal mail was rejected without her permission in January 2011;
2. Defendant Horn improperly confiscated Rountree's religious books in early 2011;
3. Rountree was denied access to legal publications in January 2011; and
4. VDOC refuses to allow Rountree to stand on her prayer rug during count procedures, which she alleges substantially burdens her Buddhist faith in violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc to 2000cc-5 ("RLUIPA").

See Dkt. Nos. 93, 94. The court addresses each claim separately herein, and the facts pertaining to each claim will be discussed in context.

## II.

Summary judgment is proper under Rule 56 where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment motion, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The court must "view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary

judgment. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986). Notably, the non-moving party "may not rest upon mere allegations or denials." <u>Wilkins v. Montgomery</u>, 751 F.3d 214, 220 (4th Cir. 2014) (citation omitted). For a party's evidence to raise a genuine issue of material fact sufficient to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." <u>Id.</u>[2]

Because Rountree is proceeding <u>in forma pauperis</u>, the court also has an independent obligation to dismiss at any time any claim that fails to state a claim, or seeks damages from someone who is immune from them. <u>See</u> 28 U.S.C. § 1915(e)(2)(B).

## A.    Personal Liability of Defendants

Defendants first argue that, as to a number of the defendants, Rountree has not adequately alleged any facts to show that they were personally involved in the alleged violation as required to state a claim against them. The court has considered defendants' arguments and Rountree's response thereto, and agrees that most of the defendants are subject to dismissal for lack of personal involvement in the alleged violations of Rountree's rights. <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (2009) ("a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"); <u>Blount v. Phipps</u>, No. 7:11cv594, 2013 WL 831684, at *5 n.12 (W.D. Va. Mar. 6, 2013) (citing <u>Burt v. Mitchell</u>, 589 F. Supp. 186, 192 (E.D. Va. 1984)) ("[g]enerally, prison officials are absolutely immune from liability stemming from their participation in the inmate grievance process"). Furthermore, because the court's rulings herein will result in the dismissal of her first three claims, most of the

---

[2]   In her response, Rountree cites to Fed. R. Civ. P. 56(d) and requests discovery to be able to respond more fully to the summary judgment motion. Dkt. No. 106 at 4. She does not specify what precise information she needs, however, or why she is unable to oppose the summary judgment motion without it.

defendants are subject to dismissal for the additional reason that there is no remaining claim against them.

As to Rountree's fourth claim, which the court takes under advisement pending a summary judgment hearing to be held on March 23, 2015, she names four defendants: Harold Clarke, J. Jabe, P. Baskerville, and D. Radcliffe-Walker. Defendants do not dispute that P. Baskerville (the former warden at FCCW) is properly named as a defendant in claim four because she is alleged to have been personally involved in the constitutional violation.

Defendants argue that the complaint is insufficient to establish the personal liability of any of the other defendants, in either their individual or official capacities. The court agrees. Rountree essentially alleges that she complained to these other three defendants and that they failed to assist her. This is insufficient to confer individual liability. See Blount, No. 7:11cv594, 2013 WL 831684, at *5 n.12. Accordingly, defendants Clarke, Jabe and Radcliffe-Walker are entitled to summary judgment and will be dismissed.

The court notes, however, that part of the relief Rountree seeks in her fourth claim is injunctive in nature. In the event that Rountree prevails on this claim and it is determined that she is entitled to injunctive relief, there must be some defendant in the case that can be ordered to implement that injunctive relief. Although defendants do not identify who that individual would be, it appears that the warden of FCCW would be best positioned to implement the relief, especially since the policy challenged in claim four appears to have been created or enforced at a facility level. Accordingly, pursuant to Fed. R. Civ. P. 25(d), Tammy Brown, current Warden of FCCW,[3] is hereby added as a defendant and substituted in place of Baskerville as to the official capacity claims against Baskerville. See Fed. R. Civ. P. 25(d); Hafer v. Melo, 502 U.S. 21, 25

---

[3] Tammy Brown assumed the position of Warden at FCCW on December 1, 2013. Dkt. No. 100-1, Brown Aff., at ¶ 1.

4

(1991) (the real party in interest in an official-capacity suit is the governmental entity and thus "when officials sued in this capacity in federal court die or leave office, their successors automatically assume their roles in the litigation").

The court further notes that defendants properly contend that Rountree cannot obtain any damages against defendants in their official capacities under Section 1983. Dkt. No. 100 at 27 (citing Will v. Mich. Dep't of State Police, 491 U.S. 58 (1989)). Rountree does not dispute this. Indeed, in her response, she expressly agrees to the dismissal of all her Section 1983 damages claims against defendants in their official capacities. Dkt. No. 106 at 26.

In light of the foregoing, and the court's rulings herein as to claims one through three, all defendants other than P. Baskerville will be dismissed. Baskerville would otherwise remain as a defendant in her individual capacity as to claim four, but because the court concludes that no claim for money damages against her will lie in her individual capacity, she will also be dismissed.[4] Tammy Brown is substituted in Baskerville's place as to the official capacity claims against Baskerville in count four, which are taken under advisement.

## B.    Claim One – Interference with Legal Mail in January 2011

In her first claim, Rountree alleges that she sent letters to approximately ten law firms in the last three months of 2010, seeking legal representation to assist her in challenges to various terms of her confinement and certain actions of defendants. After not receiving a response from any of them, she wrote again to the same firms asking for some sort of reply. Supplement, Dkt. No. 94 at ¶¶ 4-5.

---

[4] Rountree's claim of money damages under Section 1983 against Baskerville in her individual capacity is not barred by Eleventh Amendment immunity. As discussed infra, however, the court concludes that RLUIPA does not allow Rountree to recover money damages and that qualified immunity bars any damages claim against Baskerville as to claim four.

5

In response, she received a "non-legal" letter from Jeff Fogel, one of the attorneys she had written. Fogel allegedly responded that "he had been trying to send [Rountree] affirmative responses to her requests but that his legal mail to her had been rejected. He had been told that it was rejected by [Rountree] herself." Id. at ¶ 6. Rountree denies ever rejecting any mail during her incarceration at FCCW. Id. at ¶ 7. She also claims that no one ever told her that any mail from any of the attorneys she had written had been received and rejected.

She claims that she was injured by this interference with her legal mail because the "refusal of Jeff Fogel's offer of legal help deprived Plaintiff of a meaningful access to the court system necessary to obtain release from incarceration, unhindered practice of her Buddhist beliefs, and access to legal and religious books necessary to both her faith and her self-representation in the legal system." Id. at ¶ 14. She further alleges that "without access to the legal help offered by Jeff Fogel, Plaintiff lacks representation to gain post-conviction relief and advocacy regarding the conditions of her incarceration." Id. at ¶ 15.

To state a constitutional claim for denial of access to the courts, a prisoner must show that the alleged interference "hindered [her] efforts to pursue a legal claim." Lewis v. Casey, 518 U.S. 343, 351 (1996). As the Fourth Circuit has long held, a prisoner must allege adverse consequence resulting from the interference. See White v. White, 886 F.2d 721, 724 (4th Cir. 1989). In Lewis, the Supreme Court made clear that a deprivation of a prisoner's right of access to the courts is actionable only where the prisoner is able to demonstrate actual injury from such deprivation. 518 U.S. at 349. An actual injury occurs only when the prisoner is deprived of the necessary tools "to attack [her] sentence[], directly or collaterally, and . . . challenge the conditions of [her] confinement." Id. at 355. Actual injury is shown by demonstrating that a "nonfrivolous legal claim" was frustrated or impeded by some actual deprivation of access. Id.

6

at 352-53; Christopher v. Harbury, 536 U.S. 403, 415-16 (2002) (explaining that the underlying nonfrivolous claim must be described in the prisoner's complaint).

Thus, to survive dismissal, the "inmate must come forward with something more than vague and conclusory allegations of inconvenience or delay in [her] instigation or prosecution of legal actions . . . . The fact that an inmate may not be able to litigate in exactly the manner [she] desires is not sufficient to demonstrate the actual injury element of an access to courts claim." Lacey v. Braxton, 2011 WL 3320801, at *12 (W.D. Va. Aug. 1, 2011) (citations omitted).

Even accepting all of the allegations by Rountree as true, the court concludes that she has failed to state a claim of a denial of access to the courts. As an initial matter, she has not alleged that defendants deliberately interfered with privileged mail from Fogel, as opposed to a mere negligent handling of her mail. See Pink v. Lester, 52 F.3d 73, 75-76 (4th Cir. 1995) (negligent actions which interfere with an inmate's litigation efforts are not actionable under § 1983) (citing Daniel v. Williams, 474 U.S. 327 (1986)). Additionally, "[o]ccasional isolated incidents of delay or non-delivery of mail do not rise to a constitutional level." Short v. Shearin, 2014 WL 3557236, at *8 (D. Md. July 17, 2014) (citing Gardner v. Howard, 109 F.3d 427, 430-31 (8th Cir. 1997) ("We have never held or suggested that an isolated, inadvertent instance of opening incoming confidential legal mail will support a § 1983 damage action.")); Smith v. Maschner, 899 F.2d 940, 944 (10th Cir. 1990) (no constitutional violation where defendants admitted to opening one piece of prisoner's protected legal mail by accident, especially without any "resulting interference with [his] right to counsel or access to the courts").

Even if a reasonable inference of deliberate conduct could be drawn from Rountree's allegations, she has failed to establish an actual injury. Although she alleges in cursory fashion that she was prevented from challenging the conditions of her confinement, she has clearly done

7

so in this lawsuit. The only specific injury she identifies is the dismissal of some of her claims in this suit on exhaustion grounds. But there is no plausible basis for concluding that having Fogel assist her in this lawsuit (even assuming he was willing to do so, a fact she has not explicitly pled) would have affected her failure to exhaust her claims, particularly since exhaustion of administrative grievances must be accomplished within the structure of VDOC's internal procedures and by the prisoner before filing suit. Additionally, by her own admission, Rountree has had subsequent contact with Fogel, and (at least to the court's knowledge), he nonetheless does not represent her, either in this suit or elsewhere. Thus, the complaint does not plausibly allege that Rountree was prevented from pursuing a non-frivolous legal claim as to the conditions of her confinement because she did not receive his first response letter.

Similarly, although Rountree claims that the interference prevented her from successfully pursuing post-conviction remedies by herself, Dkt. No. 106 at 18, she does not provide any information to support that assertion. She has not presented any evidence that any direct or collateral criminal appeals were pending or adversely affected due to her not receiving the first letter from Fogel. She also fails to identify what non-frivolous claims she would have raised in seeking post-conviction relief or how she was impeded from raising such a claim because she did not receive the initial response from Fogel. See Lewis, 518 U.S. at 352-53 (requiring specific showing). For all of the foregoing reasons, the court concludes this claim is subject to dismissal under Fed. R. Civ. P. 12(b)(6).

## C.   Claim Two – Confiscation of Religious Books

Rountree alleges in claim two that defendant S. Horn confiscated religious books from her in early January 2011. See Dkt. No. 94 at 10-11. According to Rountree, at the relevant time, Horn was responsible for insuring that incoming property and books sent to inmates were kept

8

safe and timely delivered to inmates according to "the laws and policies" set by VDOC. She claims that, in contradiction of VDOC policy, Horn improperly determined that Rountree was not allowed to receive several books sent to her in November and December 2010 by a Reverend L. Barsel and J. Kunzer. Rountree was not informed of FCCW's receipt of the books or that they were being held. She alleges that she did not learn of these facts until she heard from the senders in January 2011 that they had sent the books. She further alleges that around the same time, "FCCW's Chaplain Julie Perry informed Plaintiff that she had not received any religious books on Plaintiff's behalf as she had expected, since the religious books set by Barsel and Kunzer had been sent via the Chaplain." Dkt. No. 94 at 10. When Rountree asked Horn for the books that had been sent her, Horn admitted that about 4-5 religious books had come in for her, but refused to give them to her. "He said that he did not have to follow the federal law or policy if he did not want to." Id. The books "subsequently went missing and were not recovered." Id.

Defendants argue that this claim fails because Rountree has failed to identify "what the religious books were, how they would assist her in the practice of her chosen religion, or why these books were rejected by Sgt. Horn." Dkt. No. 100 at 14. They construe this claim as alleging a violation of her First Amendment rights and her rights under RLUIPA and argue that she has not met the standards for establishing either alleged violation.

As to whether or not proper procedure was filed in rejecting whatever religious books may have been sent, defendants have provided testimony explaining the policy applicable to incoming books and publications. Specifically, defendants have offered the following explanation (supported by affidavits) regarding the policy governing inmates' access to books:

> Former Operations Manager, K. Stapleton was in charge of
> reviewing incoming books and publications. Stapleton Aff. ¶ 4.
> Virginia Department of Corrections (VDOC) Operating Procedure
> (OP) 802.1, effective August 1, 2009, Offender Property, requires

9

that all offenders submit a Personal Property Request Add/Drop form, with required documentation attached, and receive permission from the Facility Unit Head or his designee prior to ordering any item by mail - including books. Id., Encl. A. Offenders were not allowed to receive books or publications unless they had followed proper procedures to obtain them. Id. at 5. Procedures required that the offender submit a request, to include an order form from the publisher and a withdrawal slip to have money deducted from their inmate account. Id. The request required the Assistant Warden's approval. Id. If a book was received from an outside group misrepresenting themselves as a religious group, or any unapproved source, then the book may have been returned to the sender. Id. In the alternative, the offender could choose to have the book mailed home or donated. Id.

Offenders are allowed to donate religious books, publications, and other items to the institutional chaplains, provided the VDOC Faith Review Committee approved the item(s) and the Warden or her designee gave prior written authorization. Id. at 7. In accordance with established security guidelines, these donated items were searched and logged prior to receipt by the chaplains. Id. The donated items could then be used in group services. Id., Encl. B. Therefore, the items received through the chaplains were not to be permitted to be the personal property of the prisoner. Stapleton does not recall Rountree complaining that her religious books were confiscated in early 2011. Id. at 9. However, Stapleton does recall a time when offender Rountree tried to have persons outside the prison purchase books from Barnes & Noble and have them sent to her at FCCW, which was strictly against policy. Id.

. . . Sgt. Horn denies any wrongdoing. Although former Sergeant S. Horn has very little recollection regarding the claims in this lawsuit, Horn states affirmatively that he would not have allowed offender Rountree to receive books or publications obtained in any manner not approved by VDOC policy. Horn Aff. ¶ 4. If a publication had been sent to the institution from a family or friend as Rountree states, she would not have been allowed to have it. Id. Horn did not deny or confiscate Rountree's approved religious or legal materials to harass or retaliate against Rountree. Id. at 6. Horn conducted himself in a professional manner and followed VDOC guidelines and procedures to the best of his ability and accordance with training. Id. at 5.

Dkt. No. 100 at 17-18 (formatting altered by court); See also Dkt. No. 100-3 (Copy of VDOC

OP 802.1.)

In response, Rountree offers mostly general and vague responses to this evidence. For example, she argues that "S. Horn's protestations are self-serving and contrary to Plaintiff's experiences with S. Horn." Dkt. No. 106 at 17. She further argues that she is not required to identify the titles of the books or to otherwise explain why they were rejected, arguing that those specifics go "beyond pleading requirements and into matters appropriate for discovery." Dkt. No. 106 at 15.[5] Accordingly, her response (like her complaint, see Dkt. No. 94) does not contain the names of those books or any additional detail in support of this claim.

Despite Rountree's failure to provide detail in her supplemental complaint or summary judgment response and her failure to specifically identify other portions of the record on which she is relying, the court has located at least some of her grievance paperwork related to this claim in the voluminous record. See Dkt. No. 64-8 at 1-5. That paperwork refers to four book titles which she contends "were to be used in her religious class, Healthy Temple." See Dkt. No. 64-8 at 3. According to VDOC's response to her informal complaint (as the first step in the grievance process), the books were addressed to her and they were being held because she did not follow proper ordering procedures to receive them. That response also included copies of two invoices for the four books, all of which were ordered from Amazon by John J. Kunzer on December 20, 2010 and were shipped to "Piper A. Rountree – 100-4102 c/o Chaplain's Office – Healthy

<hr>

[5] Rountree argues that the lack of titles is "appropriately addressed in discovery" and that whether she sought a religious title or a comic book raises only "questions of fact appropriate for trial, not a matter of law appropriate for a Summary Judgment." Dkt. No. 106 at 15-16. But she fails to explain why she needs discovery from defendants to enable her to know the titles of the books she claims were rejected. Particularly if she had followed the proper procedure and submitted a request for the book, she would already know the titles.

Temple Class" at FCCW.[6] Dkt. No. 64-8. The portions of the paperwork reviewed by the court do not indicate the ultimate disposition of the books.

Rountree's complaint does not make clear what legal claims she intends to assert as to this alleged confiscation. Cf. Dkt. No. 94 at 7-14 (pages detailing facts regarding claim two and resulting damages). The details surrounding this claim are listed in the midst of a number of other complaints about Horn's alleged conduct toward Rountree, but the court has already held that she did not properly exhaust those claims, and thus the court does not consider them. She claims that she suffered severe emotional damages and trauma as a result of Horn's conduct, that "her educational and spiritual needs were irreparably damaged or lost" and that "her dedication to and faith in the viability of the U.S. Constitution had been broken."

Based on her allegations, the court construes the claim as a claim that her rights under the First Amendment and RLUIPA have been violated. The court concludes, however, that Rountree has wholly failed to meet her burden to plead a religious interference claim. The First Amendment provides that "Congress shall make no law ... prohibiting the free exercise thereof." U.S. Const. amend I.; Cruz v. Beto, 405 U.S. 319, 322 (1977). To prove a violation of this right, an inmate must first state facts sufficient to show that (1) she holds a sincere belief that is religious in nature; (2) the prison regulation substantially burdens her right to free exercise of her religious beliefs; and (3) the regulation is not "reasonably related to legitimate penological interests." O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (quotation and citation omitted); Hernandez v. Comm'r, 490 U.S. 680, 699 (1989) (noting the substantial burden portion of the test).

---

[6] The titles listed on the invoices were Meditations from the Mat: Daily Reflections on the Path of Yoga, Living Your Yoga: Finding the Spiritual in Everyday Life, Chicken Soup for the Prisoner's Soul: 101 Stories to Open the Heart and Rekindle the Spirit of Hope, Healing and Forgiveness, and A Year of Living Your Yoga: Daily Practices to Shape Your Life. Dkt. No. 64-8.

12

RLUIPA heightens an inmate's free exercise rights by prohibiting the government from imposing a "a substantial burden" on an inmate's religious exercise unless the government can demonstrate that the regulation "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). A regulation imposes a "substantial burden" if it "puts substantial pressure on an adherent to modify [her] behavior and to violate [her] beliefs." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (quoting Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 70, 718 (1981); Sherbert v. Verner, 374 U.S. 398 (1963)). No substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult" or inconvenient, but does not pressure the adherent to violate her religious beliefs or abandon one of the precepts of her religion. Smith v. Allen, 502 F.3d 1255, 1278 (11th Cir. 2007); Living Water Church of God v. Charter Tp. of Meridian, 258 F. App'x 729, 739 (6th Cir. 2007) (unpublished).

Thus, to succeed on her claim that this confiscation violated her religious rights under the First Amendment or RLUIPA, she must first show having the books confiscated substantially burdened her religious practice.[7] See O'Lone, 482 U.S. at 349; Lovelace, 472 F.3d at 187. Although Rountree alleges she suffered great emotional anguish at the general course of conduct by Horn, she has not alleged—let alone met her burden in responding to the summary judgment motion—that the confiscation of these particular religious books "substantially burdened" her religion. See, e.g., Lacey v. Braxton, 2011 WL 3320801, at *10 (W.D. Va. Aug. 1, 2011) (inmate failed to show how confiscation of ten religious books substantially burdened his

---

[7] Rountree further claims that defendants, for the first time in their summary judgment motion, claim that Horn was "legally authorized to reject religious books delivered to plaintiff." She argues that this explanation by defendants is a "privilege" or "license" which is an affirmative defense and should be barred as untimely. Dkt. No. 106 at 14. The court finds no merit in the contention that this explanation is an "affirmative defense" and does not address this contention further.

13

religious practice where he retained other religious texts and had the opportunity to purchase others in accordance with the policy governing personal property; the policy itself was valid); Marron v. Miller, 2014 WL 2879745, at *2 (W.D. Va. June 14, 2014) (dismissing claim that religious books were improperly confiscated where inmate failed to describe the books' importance to his ability to practice his religious beliefs).

The court also concludes that, to the extent Rountree's challenge is to the policy itself, (and its restrictive procedure for receiving books and its requirement that she possess no more than a certain number of books), she has not shown that the policy is not "reasonably related to legitimate penological interests.'" Lovelace, 472 F.3d at 199 (citing Turner v. Safley, 482 U.S. 78, 84 (1987)). Whether a regulation is reasonably related depends on:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right ... remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

Id. at 200 (citing Turner, 482 U.S. at 89–92). The prisoner has the burden of proof to disprove the validity of a prison regulation pursuant to the Turner analysis. Overton v. Bazzetta, 539 U.S. 126, 132 (2003).

Rountree has not met her burden. OP 802.1 is reasonably related to VDOC's legitimate penological interest to maintain institutional security. It allows for adequate review of publications, limits the personal property available to defendants, and ensures that there is a

14

listing of what property an inmate may maintain. See also Lacey, 2011 WL 3320801, at *9 (concluding that "[OP] 802.1 is reasonably related to VDOC's legitimate penological interest to maintain institutional security.")

To the extent Rountree is challenging the application of the policy to her (or that Horn did not follow the policy with regard to her), she has failed to adduce facts showing that the policy was in fact violated. It appears that the rejected religious books were sent by persons outside the prison system to Rountree. If that is the case and if Rountree had not followed the proper procedures to pre-authorize being sent those books or to establish the sender as being an approved sender, then VDOC officials correctly followed their policy in rejecting those books. Certainly, Rountree has not provided any detail to show that she complied with her obligations under the policy to ensure she could receive those materials. Additionally, although she says they were sent to the chaplain, they were addressed to Rountree "care of" the chaplain. While that means that they would normally be given to the chaplain, they are still addressed to her, as if the sender was sending them to her. VDOC's policy prohibiting offenders from retaining as personal property books that are to be used in religion classes would be violated if the books were released to Rountree.[8]

Even if she could show that the policy was improperly applied to her, however, she has not stated a claim of constitutional magnitude. The intentional or negligent deprivation of

---

[8] Neither defendants nor Rountree offer a clear picture of the precise contours of the policy at the times these books were ordered and/or received. The court is aware, however, that VDOC's policy governing incoming publications was in flux during the latter part of 2010. See, e.g., Couch v. Jabe, No. 7:11-cv-34, 2012 WL 3043105, at *1 n.1 & *2 (W.D. Va. July 25, 2012) (discussing revisions to OP 803.2, governing the receipt of publications, and noting that on November 1, 2010, OP 803.2 (titled "Incoming Publications" and which was applicable to religious literature) was amended to reflect that "inmates could now receive [certain] publications if a third party paid for the publication, but inmates still needed to obtain preapproval via a property request form to receive it."); see also Dkt. No. 100 at 4 (citing to Horn's affidavit there "[t]here was a time when offenders were required to order all items through their own account and family/friends were not allowed to order for the offender.") (emphasis added).

15

personal property by a prison employee acting outside the scope of official policy or custom does not rise to the level of a constitutional violation so long as the state provides an adequate post-deprivation remedy. See Hudson v. Palmer, 468 U.S. 517, 536 (1984); Parratt v. Taylor, 451 U.S. 527 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 331 (1986). Both the VDOC grievance procedure, which Rountree utilized, and the Virginia Claims Act, provide adequate remedies. Ballance v. Young, 130 F. Supp. 2d 762, 767 (W.D. Va. 2000); Virginia Code § 8.01-195.3. Furthermore, a claim that prison officials have failed to follow their own policies or procedures generally does not state a constitutional claim. United States v. Caceres, 440 U.S. 741, 752-55 (1978). Thus, Rountree cannot show that any defendant violated her constitutional rights based on any property loss. For all of these reasons, the court concludes that defendants are entitled to summary judgment as to Rountree's second claim.

## D. Claim Three – Denial of Access to Legal Materials

In her third claim, Rountree alleges that she was denied access to legal books in January 2011. Specifically, she claims that she subscribed to a publication called Prison Legal News, that delivery of it was "sporadic," and that, from November 2010 through January 2011, defendants altogether "failed to deliver" the publication to her. She also claims that in November of December of 2010, she had a family friend order a jailhouse lawyer type of reference book from PLN, but when it arrived, Horn stated that she could not have it and the book then "went missing." Dkt. No. 94, Compl. at ¶¶ 38-40.

Defendants construe this claim as a claim for interference with her access to the courts. They point out that Rountree has not alleged she was involved in any litigation at the time these publications were allegedly denied. They further note that, if a family friend ordered a book for her, she would not have been permitted to receive it under the policy in effect at that time.

16

Additionally, they contend that, as to the PLN issues not being delivered, she fails to allege any particular person who she believes caused the rejection of these publications. Instead, she merely contends that she ordered them and did not receive them. She concludes from this that prison officials must have denied her right to them. Defendants contend that her allegations fail to satisfy the plausibility standard under Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), which requires more than "a sheer possibility that a defendant has acted unlawfully." Dkt. No. 100 at 18-21.

In her response, Rountree argues that the same policy defendants rely upon in rejecting these publications (OP 802.1) is the same one that "NLG found to be violating inmates' constitutional rights." Dkt. No. 106 at 27-28. Rountree fails to point to any court order so stating, however. Instead, she relies on what was previously attached as Exhibit HHH to her original complaint, which is a settlement agreement in the case of Prison Legal News, Inc. v. Johnson, No. 3:09cv68 (W.D. Va.) ("PLN"). See Dkt. No. 3-4.[9]

Rountree was not a party to PLN or to the other case she references, the NLG case. See supra note 9. Notably, moreover, both cases were settled between the parties and in both cases, the only order entered by the court was one dismissing the case. Thus, although she alleges that the NLG court "found" that the policy relied upon here violated inmates' constitutional rights, no such finding was made by the court in either of those cases and no legal or factual findings on

---

[9] In prior filings, Rountree has identified the case she relies on as National Lawyers' Guild, et al. v. Gene Johnson with a "Cause No. 3:09cv68." That case number is the PLN case, and the complaint in PLN alleged that the defendants—various VDOC officials or employees—engaged in censorship of a publication called "Prison Legal News." See PLN, No. 3:09cv68 (W.D. Va.), Dkt. No. 1 (Oct. 8, 2009, Complaint). The case with the closest name to what she cites is Nat'l Lawyers Guild, Inc. v. Johnson, No. 3:10cv40 (W.D. Va.) ("NLG"). The complaint in NLG alleged that the defendants—various officials with the VDOC—improperly prevented prisoners from receiving copies of a publication called the "Jailhouse Lawyer's Handbook," which was co-authored and co-published by the plaintiffs—National Lawyers Guild, Inc. and Center for Constitutional Rights. See id. at Dkt. No. 1 (July 21, 2010 Complaint).

17

VDOC policies were ever issued in those cases. Her reliance on the supposed invalidation of OP 802.1 on constitutional grounds is therefore misplaced.[10]

In the PLN settlement agreement so heavily relied upon by Rountree, VDOC agreed to some changes to its incoming publications policy, however, and those changes were apparently implemented at around the same time that Rountree complains she did not receive the PLN publications she or her family friend had ordered. Specifically, in that agreement, VDOC agreed that it would "no longer require that all incoming publications can only be purchased with funds maintained in a prisoner's institutional account" and "instead will allow periodicals (including [Prison Legal News]) and books to be purchased by third parties for prisoners." Dkt. No. 3-4 at 4, ¶ 4. The same paragraph of the settlement agreement also stated that "VDOC may maintain its existing policy to the effect that incoming publications will only be allowed for receipt into state correctional facilities so long as the publication comes from an approved source" and expressly deemed PLN an approved source. Id. In the same paragraph, VDOC also "specifically reserve[d] the right to return to court to seek modification of this provision [at] any time should its experience with this provision result in unforeseen consequences." Id. The settlement further provided that prior issues of PLN that had been disapproved should be allowed to be sent to inmates and required specific and timely notice to PLN in the event any future issue of PLN was disapproved by VDOC. Dkt. No. 3-4 at 3.

---

[10] Rountree also contends that Policy 803.1 should control in this case Dkt. No. 106 at 20-21 (citing Exhibit EV 4.1, which is Dkt. No. 67-3) because she was a "verified attorney" and receiving a legal reference book was necessary to pursue her own legal work. OP 803.1 is titled "Offender Correspondence" and contains specific provisions governing legal mail, which is defined as mail to or from "verified attorneys." See Dkt. No. 67-3 at 1. The fact that Rountree was a licensed attorney before her conviction—or even while incarcerated—does not automatically entitle her to the right to pursue that occupation with special privileges not available to other inmates. She has not provided authority to the contrary. Thus, for purposes of this opinion, the court concludes that mail addressed to her and not sent by an attorney is not legal mail under OP 803.1.

Assuming the revised policy as contemplated in the January 2010 settlement agreement was the one in full force and effect in late 2010 and early 2011,[11] it is clear that PLN periodicals could have been ordered by family and friends at that time. But nothing in the settlement agreement as read by the court changed the requirement that an inmate must nonetheless identify the third party purchase of any book on a personal property request add/drop form and must secure permission prior to order or receiving a book by submitting such a form. Moreover, the evidence from defendants, supported by affidavit, states that the property request add/drop form was required. Indeed, even the current VDOC policies so provide, at least as to books.[12]

In light of this background, the court turns to a determination of whether Rountree has adequately stated a claim. First of all, as explained above, she has not identified who supposedly rejected any of her PLN issues nor has she provided any information that they were, in fact, received at FCCW and rejected. Similarly, as applied to her claim that the Jailhouse Lawyers' Handbook available from PLN was rejected, she has not shown that the family friend was on the "approved list" for sending publications. This alone provides a valid reason under the policy for VDOC to reject the book under its policy.

Even if she could provide such evidence, moreover, her claim fails for similar reasons discussed in analyzing her first two claims. To the extent this is a claim of deprivation of

---

[11] Defendants acknowledge a change in policy, but do not explain its timing. See supra note 8 (quoting Horn's affidavit that at one time, "offenders were required to order all items through their own account and family/friends were not allowed to order for the offender," thereby implying that portion of the policy changed at some point).

[12] See 802.1, Operating Procedure 802.1, dated August 1, 2012 and entitled "Offender Property," available at https://vadoc.virginia.gov/about/procedures/documents/800/802-1.pdf (last visited March 8, 2015) (requiring the submission of property request add/drop forms to order any authorized item by mail, but allowing subscriptions to periodicals (newspapers, magazines, or catalogs published on a regular schedule) to be ordered by either the offender or a third party without approval from the facility and noting that the policy was changed February 27, 2014); see also OP 803.2, dated January 1, 2015 and entitled "Incoming Publications," available at https://vadoc.virginia.gov/about/procedures/documents/800/803-2.pdf (last visited March 8, 2015) (allowing third parties to purchase books for offenders, but requiring that the third party be identified on the Personal Property Request Add/Drop form before the offender receives the book and requiring shipment directly from a commercial vendor).

19

property, she has other remedies that foreclose this being brought as a constitutional claim. To the extent it is a denial of access to the courts claim, it also fails for the same reasons her first claim fails. That is, even if the conduct were intentional, she has not adequately alleged that she suffered actual injury in the form of being unable to pursue a non-frivolous claim in litigation. See Lewis, 518 U.S. at 352-53.

Finally, to the extent that this claim could be construed as a claim that she was denied a publication in violation of her First Amendment rights, the court concludes that summary judgment in defendants' favor is proper. Although she claims she did not receive issues of PLN for a three-month period, she has not provided any information to show that she ordered such publications (other than her bare allegation), that she followed required property ordering procedures, that the publications were received by the prison, or that they were, in fact, rejected. There is no allegation as to which defendant acted to deny, destroy, or reject such publications. She also has not shown that, even if her failure to receive those issues was in fact due to some prison official's actions, that such action was intentional or otherwise states a constitutional claim. See discussion of claim two supra.

Her claim that Horn told her she could not have the "Jailhouse-lawyer's type of legal reference book" published by PLN suffers from similar infirmities. Most notably, she has wholly failed to explain or show that she complied with the policy in obtaining the publication. She stated that it was ordered by a "family friend," and as defendants explain, that provides the most likely reason why it was rejected. As set forth above in detail, defendants have offered competent evidence of a VDOC policy requiring Rountree to take certain actions before being permitted to receive such a book. Rountree has not alleged or shown that she complied with that

20

policy in order to receive the publication to which she refers. For all of these reasons, claim three will be dismissed.

### E. Claim Four – Prohibition Against Using Her Prayer Rug During Count Procedures

Rountree's fourth claim alleges that she has been prohibited from standing on her prayer rug during count procedures and that this practice substantially burdens her Buddhist faith, in violation of both her First Amendment rights and RLUIPA. Specifically, she explains that her faith requires her to pray at all times and that "standing on a prayer rug is necessary and a significant part of her sincere daily religious practices as a Buddhist." Dkt. No. 106 at 22. She also offers to explain to the court "how her fundamental Christian values also interact and support her Buddhist practices."

Defendants counter that the policy of prohibiting her from using her prayer rug during count furthers important security concerns. They assert that their policy, VDOC OP 802.1, permits inmates to possess prayer rugs, and that such prayer rugs must be reasonably stored in a provided storage space when not in use. Defendants offer the affidavit of the current warden at FCCW, stating that, for safety and security reasons, prayer rugs are not to be hung on walls or continuously maintained on the floor and that, while Rountree may have her prayer rug out while in use, it must be put away during count. See Dkt. No. 100-1, Brown Aff. and Exhibit A thereto.

Rountree correctly notes that OP802.1 does not contain any limitations on the use of the prayer rug during count. The policy simply permits offenders to have "1 prayer rug (maximum 30 inches wide, 43 inches long) – reasonably stored in storage space provided when not in use; not to be hung on walls or continuously maintained on the floor" Dkt. No. 100-3 at 22. The written policy does not state that it must be put away during count.

21

Brown's affidavit, however, explains FCCW's security and safety justifications for disallowing use of the prayer rug during count. First, Brown explains that count occurs at the same time every day, is announced at scheduled times, and usually lasts thirty minutes. During the hours of 5:30 am until 9:30 pm, each count is to be a "standing count," requiring all offenders to stand, except those medically exempted. Offenders in the housing units must stand in front of their bunks. During count, security staff is required to physically observe and account for each offender. Staff also observes the living area to check for any unusual activity or items and to do so, "must have an unobstructed view of the cell so that they can observe the occupants and the living area." Dkt. No. 100-1, Brown Aff. at ¶ 6.

Brown offers three basic reasons why use of the prayer rug is not permitted during count. First, she explains that prayer rugs are not permitted on the floor during count because they may be used to conceal contraband. Allowing an offender to then stand on that rug would further conceal anything underneath it. Second, she asserts that the rug may interfere with a cellmate's access to the bunk area, since both cellmates are required to stand in front of the bunk during count. This creates the potential for arguments or physical altercations. Third, Brown claims that the rug creates a tripping hazard.[13] Brown also notes that Rountree may create a prayer schedule so that she has ample time to pray before and after count procedures.

In response, Rountree disputes much of the factual basis for defendant's purported security justification. As an initial matter, she claims that the purpose of count is not to inspect cells, but to simply verify that the two women assigned to each cell are physically present. She

---

[13] Defendants do not explain how the rug is more of a tripping hazard during count procedures than at other times when its use is permitted. Furthermore, this purported justification is undercut by Brown's description of the count, as requiring that "all movement of offenders . . . cease from the time the count starts until it is cleared." Brown Aff. at ¶ 6. If no offender is moving within the cells, and officers are observing only from outside the cells, it is unclear to the court who might potentially be tripping on the rug during count.

22

describes the count as taking thirty minutes and that during that time, two officers quickly walk by approximately 120 cells to verify that two inmates are present in each. She also points out that during night-time counts, no one is required to stand and that inmates are instead "buried under sheets and blankets." Dkt. No. 106 at 9. Thus, in her view, the count is about counting inmates, not inspecting cells.

She also contends that the use of her flat, floor-level mat—which she describes as the thickness of a thinly-worn sweatshirt—poses no greater risk to security when used during count than it would when used at any other time. Id. She also asserts that count is not "obstructed or impeded where college physics books, hair bows, nail polish, and make-up items lay about [nor by the fact that large and thick shirts, bathrobes, bath towels, and other items of apparel remain hanging and bunched up on wall hooks." Id. at 10. She also states that the standing floor space in a cell of "more than 6' x 9' allows for a small 2' x 3' prayer rug without impeding movement or access of either inmate and points out that there are two 6' x 2.5' x 6" mattresses and bedding laying behind the standing inmates." Id.

As already noted, to state a claim that prison officials or regulations have violated an inmate's right to free exercise of religion, Rountree must prove that she holds a sincere religious belief, as opposed to a secular preference, and that the official action or regulation substantially burdened her exercise of that belief. Hernandez v. Comm'r, 490 U.S. 680, 699 (1989). The Supreme Court defines a "substantial burden" as one that "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs," Lovelace, 472 F.3d at 187 (citations omitted, or that forces a person to "choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand." Sherbert v. Verner, 374 U.S. 398, 404 (1963).

23

A prison policy that may substantially burden an inmate's ability to practice his religious beliefs nevertheless withstands a First Amendment challenge when it is rationally related to furtherance of a legitimate governmental or penal interest. O'Lone, 482 U.S. at 349; Turner, 482 U.S. at 89-91. The prisoner has the burden of proof to disprove the validity of a prison regulation pursuant to the Turner analysis. Overton, 539 U.S. at 132.

RLUIPA employs similar, albeit not identical standards. To succeed on her RLUIPA claim, Rountree bears the initial burden of establishing that the challenged policy or practice substantially burdens her exercise of religion. Couch v. Jabe, 679 F.3d 197, 200 (4th Cir. 2012). If that burden is met, then the government must prove that the challenged policy is the "least restrictive means of furthering a compelling governmental interest." Id.

Defendants claim that the reason for disallowing use of Rountree's prayer rug during counts is based on security concerns and the Supreme Court has recognized that prison security is a compelling state interest. Cutter v. Wilkinson, 544 U.S. 709, 723 (2005). Moreover, RLUIPA requires "due deference to the experience and expertise of prison . . . administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Id. To determine whether a given policy or procedure is the least restrictive means of achieving this compelling interest, the court must ascertain whether the government has sufficiently explained its policy in that respect, and whether the government acknowledged and considered less restrictive alternatives. Couch, 679 F.3d at 203; Lovelace, 472 F.3d at 190.

The court will apply the foregoing principles to the facts in this case, but does not rule on claim four at this time. Instead, the court takes claim four under advisement, pending a summary judgment hearing to be held on March 23, 2015. In particular, the court will hear argument

24

and/or evidence regarding Rountree's religious beliefs and as to whether the challenged policy "substantially burdens" her religious practice. The court will also hear argument and/or evidence as to whether or not the policy prohibiting the use of the prayer rug during count is the least restrictive means of achieving what is indisputedly a compelling interest of prison security (the ability to easily and safely conduct count procedures).[14]

## F. Claim Four – Damages and Qualified Immunity

Although the court is taking claim four under advisement at this time, there are additional issues regarding the damages available to Rountree that the court can address without the benefit of argument or additional evidence. First, with regard to Rountree's claim under RLUIPA, the statute does not authorize a private cause of action for money damages against state prison personnel for actions taken in their official or individual capacities, because the statute does not waive the state's sovereign immunity under the Eleventh Amendment. Sossamon v. Texas, __U.S.__, 131 S. Ct. 1651, 1660 (2011) (official capacity); Madison v. Virginia, 474 F.3d 118, 133 (4th Cir. 2006) (same); Rendelman v. Rouse, 569 F.3d 182, 189 (4th Cir. 2009) (individual capacity).[15] Accordingly, Rountree's claim for money damages under RLUIPA, will be dismissed.

---

[14] Plaintiff is advised that she should be prepared to present any evidence she may want the court to consider as to any of these issues on her remaining claim. In particular, plaintiff will be permitted to call a limited number of witnesses and to present relevant documentary evidence to establish that: (1) she holds a sincerely-held religious belief that requires her to use her prayer rug during count procedures; (2) the inability to do so imposes a substantial burden on her religious practice; and (3) the policy is not the least restrictive means of achieving the prison's stated interests. If there are documents that she wants to present, but does not currently have (e.g., religious texts explaining her beliefs or operating procedures of the prison), she may specifically request that defendants bring them to the hearing. The court will issue in the coming days a more detailed order concerning plaintiff's rights to call witnesses and present evidence.

[15] The Rendelman and Sossamon decisions addressed only claims for damages against a state or state officials under the Spending Clause axis of RLUIPA. Rountree fails to allege any facts suggesting that her claims against the defendants qualify as actionable claims under the Commerce Clause section of RLUIPA. Therefore, the court concludes that defendants are entitled to sovereign immunity as to her claims under RLUIPA.

Case 7:11-cv-00572-GEC-RSB Document 110 Filed 03/09/15 Page 25 of 28 Pageid#: 2501

Defendants also argue that Baskerville is entitled to qualified immunity as to Rountree's § 1983 claim against her. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Smith v. Gilchrist, 749 F.3d 302, 307 (4th Cir. 2014) (quoting Stanton v. Sims, __ U.S. __, 134 S. Ct. 3, 4 (2013) (per curiam)). Qualified immunity involves a two-step inquiry: (a) whether the plaintiff's allegations state a claim that defendants' conduct violated a constitutional or statutory right; and if so, (b) whether that right was clearly established at the time of the alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 232 (2009) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). The court has the discretion to proceed directly to the second step of the analysis after assuming without deciding that a constitutional violation occurred, Pearson, 555 U.S. at 236, and the court utilizes that discretion here.

As to the second prong, "[a] right is clearly established if the contours of the right are sufficiently clear so that a reasonable [official] would have understood, under the circumstances at hand, that his behavior violated the right." Campbell v. Galloway, 483 F.3d 258, 271 (4th Cir. 2007). In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Saucier, 533 U.S. at 202.

Applying the foregoing standards, the court concludes that defendants are entitled to qualified immunity as to claim four (Baskerville being the only defendant left with any potential of individual liability on claim four). Quite simply, the law did not put them on notice that disallowing use of a prayer rug during count would be "clearly unlawful." There was no bright

26

line in existing precedent to place the decision made here "beyond debate." See al-Kidd, 131 S. Ct. at 2083. Accordingly, the court concludes that defendant Baskerville is entitled to qualified immunity on claim four. As a result, and because Tammy Brown has been substituted as a defendant for Baskerville on the official capacity claims, Baskerville will be dismissed.

## III.

For the reasons set forth above, the court concludes that defendants are entitled to summary judgment against Claims 1, 2, and 3 asserted by Rountree. As to her fourth claim, the court concludes that defendants are entitled to qualified immunity on that claim and that RLUIPA does not allow Rountree to seek money damages. Accordingly, Rountree's claim for money damages under claim four will be dismissed and so will defendant Baskerville. Defendants' motion for summary judgment as to Rountree's claim for injunctive relief on claim four will be taken under advisement pending a summary judgment hearing, to be held on March 23, 2015.

Lastly, the request for a jury trial in this case is hereby stricken, since only equitable claims remain. City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 719 (1999) (it is "settled law" that suits seeking only equitable relief do not give rise to a Seventh Amendment right to a jury trial); Keller v. Prince George's Cnty., 827 F.2d 952, 955-56 (4th Cir. 1987) (noting "[a] jury trial is . . . unavailable in [a 42 U.S.C. § 1983] action if only equitable relief is sought"). Any trial in this matter will be before the court. The parties are advised, however, that the court is considering the use of an advisory jury to determine any disputed issues of fact as to claim four.

The clerk is directed to provide copies of this memorandum opinion and the accompanying order to all counsel of record and to Rountree. In addition to providing Rountree

27

a copy via mail, the clerk shall also provide a copy to Rountree via facsimile to an appropriate prison official at FCCW, who shall promptly provide it to Rountree.

ENTERED this 9th day of March, 2015.

_____
Chief United States District Judge